The fact is stated in the writ that the relator "became, by virtue of said act, a patrolman and member of the police force of said district, and held office and did duty under the said act." No issue is directly taken upon that allegation. The issue is upon the previous allegation in substance, that he was a policeman — one of the police of New York — at the time the act of 1857 was passed, followed by *Page 324 
the averment that he "became, by virtue of the act, a patrolman,"c., and held office and did duty under the act. Thus the averment, that he did duty under the act, was not put in issue. The issue was properly formed upon the averment of a fact, which, if true, rendered the averment of what followed, by virtue of the act, quite immaterial; and if not true, the simple fact that he did duty under the act for, perhaps, a day or two, for this would satisfy the averment, would not entitle him to this writ. The fact, however, of doing duty under the act, would undoubtedly be evidence tending to prove a continuance in office and a holding of his office under the statute; and as the jury found that he was in office "prior to," I will say, at, the time the act was passed, it may be claimed that the defendant continued in office until he was, as is alleged in the writ, removed, unless upon material issues joined facts to the contrary are found.
By the act, section 32, it is declared that "the police in the cities of New York and Brooklyn, officers and patrolmen, shall continue to do duty under existing laws, at the passage of this act and according to the regulations of the departments of New York and Brooklyn, until after the first meeting of the board of police under this act, when the said police shall hold office and do duty under the provisions of the act hereby enacted, and as members of the police force of the `Metropolitan Police District hereby constituted.'"
The statute expressly repealed all statutes, parts of statutes and provisions of law inconsistent with the provisions of the act, and it took immediate effect.
What is the true meaning of this provision of the statute, and what effect was produced by it? The relator was a policeman, a member of the New York police force, down to the passage of the act, when his name was changed to patrolman, and by the act he was required to continue to do duty under existing laws, and according to the regulations of the department of New York, until after the meeting of the board of police under the act. Thus far nothing is said of office or holding office. But the person who, to that time, was a *Page 325 
policeman, shall continue to do duty under existing laws and according to certain regulations referred to. He shall continue to perform the duties of a policeman. The statute of 1853, under which he held office, and by virtue of which he was in office as a policeman, was repealed and ceased to exist as a law, at the moment the act, by which the policeman was required to continue to do duty under it, that is, as prescribed by it, and also according to certain regulations referred to, became a law. Whatever was done after the enactment of this statute by one who, up to that time, was a policeman, was done under this statute, and this was the only law under which the duties pertaining to the office of a policeman could be performed, and under which acts so done could be justified. Was the policeman continued in office by a new name, between the passage of the act and the first meeting of the board of police under the act? The statute does not say so, and the statute creating the office, under which he held office, had ceased to be, and with it the office had ceased. The duties of an office are things different and distinct from the office itself. One may hold an office without performing the duties prescribed. So a person may perform the acts specified as duties to be performed by one in office, and if he is directed by a superior, as in this case, the legislature, to do the acts, he can justify such acts under the command of his superior. The relator was commanded or required to continue to do duty as though the act under which he held office had not been repealed. If the office was continued by this language in the act, why should the question of office be again referred to in a subsequent part of the same sentence (after the first meeting of the board of police) in the manner to be immediately noticed? It seems to me that the relator was not in office between the time of the passage of the act and the first meeting of the board of police, when the statute declares the said police shall hold office and do duty under the provisions of the act hereby enacted, and as members of the police force of the metropolitan police district hereby constituted. After the first meeting of the board, the relator shall hold, have, possess office *Page 326 
under the provisions of the act, and do duties under the provisions of the act. He shall hold the office of patrolman "without any acceptance or affirmative act on his part." (See opinion of COMSTOCK in McCunn's case, 19 N.Y., 195.) Was the relator compelled to hold the office? Could he have been coerced to hold the office. No penalty is given in case he should refuse to hold the office under the act, and I know of no law compelling him to hold it, unless the act itself shall be so construed. I suppose it to be a general, if not universal, rule of American law, that no one can be compelled to take and hold any civil office. Statutes sometimes inflict penalties for refusing to accept an office, but I know of no law by which one can be compelled to take and hold any civil office. I do not understand that it is claimed in this case that the statute is compulsory, but it is claimed that it continued the relator in the office. I will agree that the statute made him an officer in the absence of any act on his part, that is, without requiring him to do any act evincing an intention to hold the office, but it did not compel him to hold it. The jury say that he refused to take or hold the office. What application is to be made of this language? No act of acceptance of the office was required. The question of acceptance, it is said, is not in the case. The statute, it is claimed, simply continued the holding of an office into which the officer had been already inducted, which he had previously accepted. Suppose this is conceded, could this be done by the statute, against the will of the officer? It is conceded that he could not be compelled to continue the holding of the office. Why could he not, by an affirmative act, refuse to take the thing which the legislature had made for his benefit — refuse to occupy the position to which he was assigned by the statute? The statute had changed his position, otherwise there would have been no sense in saying any thing about continuing to do duty and holding office, c. It was not, it is said, a new office, requiring an affirmative act of acceptance. But it cannot be denied that the position of the relator was changed. His name was changed, a new superior *Page 327 
was created, and the sphere of his duties enlarged, and the legislature say you shall hold the office and do duty under this act. When it is conceded that the act is not imperative, that it could not and was not designed to compel the old police to hold office under the act, what follows? The statute was permissive, or rather it contained a promise or pledge that the members of the old police should hold office, be in office, and be members of the new police force, and it so appointed them, subject, of course, to their right to refuse to occupy the new position, or thus to hold, or have, or possess, the office, but requiring no affirmative act whatever, on their part, as a qualification for, or as evidence of, such holding of office. It was equivalent to saying to the then policemen, You, gentlemen, you shall do duty under existing laws, and until the happening of an event named, the meeting of the new board, and then you shall hold office and do duty under this act, c., and no further appointment shall be necessary, nor are you required to do any act by way of acceptance or as evidence that you will hold the office, c. Now all this would not deprive a policeman of the right to refuse to take or accept this continuing to do duty, c., and then the holding office and doing duty under the act. It therefore seems to me that the finding of the jury that the relator refused to take office under the act, is not in conflict with the statute, and if so, then he never was in office, or, in the words of the verdict, never held office under the act.
But if I am wrong in this view, and it shall he held that the relator was in office under the statute, and that therefore the question of taking office, or refusing to take the office, is not in the case, the question will be, did he resign the office? and upon that question the affirmative of the issue was with the defendants. His right to resign is not questioned. From the verdict we learn that he refused to hold office under the act, under the Board of Police, established by the act.
Did not this constitute an effectual resignation? The resignation could be by parol. Resignation had its origin in agreement between the parties, the officer on the one hand, and *Page 328 
the appointing power or body, on the other hand, or the body of which the officer was a member, requiring in some cases special acts to be done, or forms to be observed evidencing the performance of the agreement, and thus perfecting the resignation. Wilcox on Municipal Corporations, says: An office may be resigned by an express agreement between the officer and the corporation.
The principle is, that the office may be vacated by agreement; and the question in each case will be, how may this agreement be evidenced, and what shall be evidence that it has been executed, so that the resignation had become perfected. The law often provides what shall be the evidence. Wilcox says: An officer elected, of which an entry is made in the public books, may resign by parol, and the resignation may be completed by making an entry in the books. (§§ 609, 611.) This will furnish evidence of a complete resignation. He does not say that this shall be the only evidence in the absence of any regulation, as to the mode of resigning. He says, when the constitution [law affecting the case] prescribes a particular form in which the resignation shall be made, that must be complied with in all respects. But otherwise, an alderman or capital burgess, and of course inferior officers, may resign by letter to the corporation, as is the manner in London, or by word of mouth, as by declaring before a corporate assembly that he resigns his office, or will continue no longer in the corporation, and requesting them to accept his resignation. But if a man, speaking at large, declares that he will be no longer an alderman, this does not amount to an offer to resign. (§ 612.) He adds, in the next section: To complete a resignation, it is necessary that the corporation manifest their acceptance of the offer to resign, which may be done by an entry in the public books, or electing another to fill the place, treating it as vacant. The principle then is, that resignation rests upon agreement, and if the charter or law governing the parties prescribes the form by which the agreement is to be evidenced, such form must be complied with, as the parties have so agreed. In the absence, however, of any *Page 329 
prescribed forms or acts, I do not see why any facts which, at common law, would constitute an executed agreement, would not be sufficient. And the acts and declarations of the parties may be received as evidence of the agreement. They may not prove it, as in the case of the man speaking at large, and saying he would no longer be an alderman. This did not amount to an offer to resign. In England an office is regarded as a franchise, not so here.
The relator was a policeman under the act of 1853, and was in office by the name of patrolman, by the act of 1857, as we now assume, and we must look to that act to see what it was necessary for him to do, for the purpose of divesting him of his office; and if the statute is silent, and there is no other statute applicable to his case, we must go to the common law. The statute is not silent. I think it speaks very significantly. It declares "no member of the police force, under penalty of forfeiting the pay which may be due to him, shall withdraw or resign from the police force unless he shall have given one month's notice in writing to," c. This is all the act contains, relating to resigning. It does not expressly declare that a patrolman may resign, or make an offer to resign; nor was this necessary, as he would have had the right, by the common law, in the absence of any provision on the subject, to resign, or at any rate to offer to resign. But by the construction that must be given to this provision in the statute, a member of the police force has the absolute right to resign without consulting the Board of Police, or any other person, and without their consent to, or acceptance of, the resignation, subjecting himself to the penalty specified, viz.: forfeiture of the pay that may be due to him at the time. This right to resign is clearly implied by the language of the act. The Board of Police cannot retain a patrolman in office any longer than he desires to retain the office. The statute contains careful provisions touching removals from office, designed to protect the officers, but no restrictions upon his right to resign, except the penalty named. It is not generally supposed in this country to be necessary to obstruct resignations of officers, *Page 330 
though guarded provisions are sometimes made, for the purpose of securing clear evidence of the resignation; as it is undoubtedly important that the question, whether an office is vacant, should not be left in doubt. No case occurs to me in which any office in the civil departments of the government may not become vacant, by the act of the incumbent alone, and this is clearly inferable from our Revised Statutes relating to resignation of office. Officers sometimes tender or offer their resignations to the appointing power, and await acceptance, and are sometimes prevailed upon to withdraw the offer; but they have, I apprehend, the right, in this country, to resign absolutely, and thus divest themselves of all the privileges, duties and responsibilities attached to the office. This is not so in all cases in England. The subject, in some cases, is bound to accept the office and perform its duties, and cannot resign without the consent of the appointing power. Hence in a general rule touching resignation, the qualification, that to complete the resignation there should be some evidence of assent by the corporation or the person to whom the resignation is offered. In this country, as the right to resign a civil office is absolute, there is no necessity of resorting to the common law principle, that the resignation rests in agreement, any further than to show how such agreement could be made, viz.: by parol. Hence it follows, in the absence of any statutory provision to the contrary, any civil office may be resigned by parol simply.
The language of the statute is peculiar: "withdraw or resign from the police force." Here is a new word, not, so far I can discover, known to the law touching the creation of vacancy in office. The law speaks of eviction or removal from office, and of resignation, express or implied, and of vacancies caused by death, c. To "resign from the police force," as here used, means undoubtedly a resignation of the office connecting the officer with the police force. This is obvious, on reading the whole section. The last clause is: "And no person who shall ever have been removed from the police force, established by this act, for cause, shall be reappointed *Page 331 
by the Board of Police to any office in the police force." Here the language, "removed from the police," is used to indicate removal from office, as such person is not to be reappointed to any office in the police force. But is to "withdraw from the police force" equivalent to resigning from such force? If the legislature intended the same thing by the use of these words, why use them both. Withdrawing from the force may be construed as retiring from the force — quitting the force, and as not amounting to a resignation of an office, which made it his duty to remain with and adhere to the force, and the breach of which duty would be good cause for removal, in addition to the penalty imposed. If this is the true construction of the statute no difficulty will arise from the finding of the jury, that the relator did not withdraw from the police force, c. A resignation being a very different thing, there would be no conflict in the facts found by the jury. But to return to resignation, as we have seen, it may be by parol, unless the charter or some statute prescribes some other mode. Is there any such prescription in this case? The Revised Statutes declare and show to whom or what body resignations of office shall be made. (1 R.S., 121, 122, § 36.) The 8th subdivision of the section reads: "By all other officers to the body, board, or officer that appointed them." There is nothing in the act requiring the resignation to be in writing, though there is language in speaking of the resignations of senators and members of assembly, from which it might be implied or inferred that it was contemplated that the resignation would, or should, be in writing. They are to resign to the presiding officer of their respective houses, who is immediately to transmit the same to the secretary of state. The reason for this requirement will, at once, occur to those familiar with our laws for the election of representatives in the legislature. I will not stop to inquire whether the common law rule is, in that instance, abrogated by implication; whether the resignation might not be made orally, and the speaker or lieutenant-governor transmit the same to the secretary of state. This language is not used in *Page 332 
any of the other cases, as the persons or bodies to whom the resignation is to be made, are the only persons or bodies to whom it is important that the fact of resignation should be made known. In Van Orsdall v. Hazard (3 Hill, 243), one Lovejoy was appointed by the colonel a member of a court martial, and after he had qualified, desired to be relieved, and the colonel consented, and appointed another person; and it was held that this was a good resignation by parol. Judge COWEN refers to the English rule and authorities, and says the resignation may be either in writing or by parol, express or even by implication, so that there be an intent to resign on one side, and an acceptance on the other. He refers to the Revised Statutes, supra, section 36, and says it goes upon the principle of these authorities, and comprehends the case before the court; thus showing that the statute has not changed the common law as to the manner of resigning. He does not advert to the fact, that in this country no one can be compelled to take or hold a civil office; and that, therefore, acceptance was not necessary, nor was there any occasion, in that case, to notice such fact.
Having shown that a valid resignation of an office may be effected by parol, let us consider in this case whether enough was done to produce resignation. The relator refused to hold the office. Being in possession, by virtue of the statute, he refused to continue in possession, he refused to have the office. What act could he have done more effectually to divest himself of the office? True, he may have said, I never took the office; I do not think the statute gave it to me, or imposed it upon me; indeed I do not believe the statute has created the office, but be these facts as they may, I refuse to hold the office. This I hold was equivalent to resignation; it was in effect resignation. He had a right to disclaim all title to the office, and refuse to hold it; and, if in fact, he had title, such disclaimer and refusal would be resignation. He refused to hold the office under the act, or under the Board of Police established by the act. It was not a mere "speaking at large," and saying I will no longer be a patrolman. It was a solemn, *Page 333 
serious refusal to hold the office under the act or the Board of Police. His acts were such as resulted in a refusal to hold the office. It may be said that this refusal was not to the Board of Police, the body to whom, regularly, the resignation should have been made. Was this indispensable? Suppose he repudiated the Board of Police, and would have nothing to do with them, at the time he refused to hold the office? Would it be necessary that they should proceed and formally remove him upon the charge and ground, that he refused to hold the office, having (§ 7) previously particularly defined and prescribed by rules, that it was the duty of the patrolman to hold office under the act, as the act required? Or could they not regard him as out of office, and at once proceed and fill the vacancy; and would he not be forever estopped from retaining the office?
It may be said that no appointment was made to fill this vacancy. How do we know this? The power of appointment is in the Board of Police, which is charged with the duty of preserving the public peace by a police force. (§§ 5 and 6.) The duties imposed of preserving the public peace in the great cities of New York and Brooklyn, are very important, and they cannot be performed without a sufficient patrol force, which it is the duty of the board to appoint; and the presumption is, that the board has performed its duty, and appointed a sufficient police force, and that it keeps such sufficient force in office at all times. It is not a case for appointing some particular person to fill a vacancy arising from the resignation of a particular patrolman. The office of patrolman is common to several hundred persons, who constitute the police force. But, as we have seen, no acceptance was necessary to complete the resignation. If, however, other patrolmen were appointed, in consequence of the refusal of the relator to hold the office, it would show that such refusal was either made to the board, or came to their knowledge, and they acted upon it, and appointed and kept in office, as was their duty, a sufficient police force. *Page 334 
If the objection, that the resignation should have been made to the Board of Police, is valid in law, is it well grounded in fact? The relator refused to hold the office under the act or under the Board of Police. This is the verdict. To whom did he refuse? There must have been some other party connected with this act of refusing to hold the office. The jury do not, by their verdict, mean that he went into the street and proclaimed to passers by, that he refused to hold the office. The fair construction of the verdict is, that he did an act or acts which constituted an effectual refusing to hold the office, and the verdict implies that he did all which it was necessary to do to divest him of the office; and if it was technically necessary that the resignation should have been made to the Board of Police, then the verdict should be construed as showing that it was so made. It is also found that the relator never has held office under the act; thus showing that he did something which they call refusing to hold office under the act, which effectually divested him of the office.
It is sufficient in a return to a mandamus to aver generally, that the relator has duly resigned his office, and such averment implies all things which the law holds essential to a resignation. (Wilcox on Municipal Corporations, § 614.) So here, when the verdict tells us that the relator refused to hold the office, and that he had never held it, the implication fairly arises that he did the acts necessary to relieve himself from the office.
I shall spend no time with the finding of the jury, that the relator not having been a member of, did not withdraw from the police force organized under the act of April 15, 1857, adding, as he could not withdraw from an office never accepted. I think, also, as the jury did, that he never accepted the office conferred upon him by the legislature, even by remaining entirely silent and passive, but he actually rejected it. But let this pass. There is no necessary conflict in the findings of the jury.
I do not attach any importance to the other fact found, that the relator, for his private gain, entered into other employments *Page 335 
in no wise connected with, and not as a member of, the police force. No legal proposition arises in this case upon this fact. As a fact it may have been some evidence upon the issues previously determined.
As I understand McCunn's case, the jury did not find, as in this case, that the relator refused to take or hold office under the act. It seems from the opinion of STRONG, J. (p. 200), that the return to the writ contained such averment; but I do not understand that the jury, by their verdict, affirmed it. If they did so find, then the other facts which they found, and which are not found in this case, so qualified such finding as to show, in the opinion of the court, that there was no such thing as resignation.
I think it important to understand what was decided in that case, and upon what state of facts, as it has not been, in what I have said, my intention to come in conflict with anything then decided. The facts, as shown by the verdict, were very different from the facts in this case. McCunn, the relator, continued to do police duty up to July 1, 1857, undisturbed, claiming, however, to act under the statute of 1853, and doubting the validity of the act of 1857. The validity of this act was declared by this court at its June term; and as soon as its decision was known, and early in July, McCunn reported himself for duty to the head of the Metropolitan Police force, and held himself ready for duty. After this the board attempted to remove him. He procured a mandamus December 11, 1857. Such facts do not appear in the present case. It is not found that the relator continued to do duty as a policeman. It is simply found that he refused to take or hold office under the act. In McCunn's case the important question was, whether he should have accepted the office and taken the official oath. Five of the judges held that no oath in his case was required. Judge GRAY, as I understand, regarded McCunn as in office, by virtue of the act, all the time after its passage. He speaks of the legislature finding him in office, and leaving him there, by an unequivocal expression of their design to do so. He makes no distinction *Page 336 
between the time intervening between the passage of the act and the first creating of the board, and the time thereafter. Judge ALLEN concurred in this opinion. Judge STRONG delivered an opinion substantially to the same effect upon the question of office. He speaks of the statute in terms effecting a mere continuance in office. Judge COMSTOCK was of the opinion, if the office was to be regarded as a new one, that the legislature had power to fill it and dispense with any oath of office, and that the policemen of the old system could be made patrolmen in the new organization without any acceptance or affirmative act on their part; and he thought this was what was done: that the men who were policemen were transferred to the new force, and so placed in office by the mere will of the legislature; that the statute was not to be regarded as a mere tender of office to the old policemen, to be accepted or not, and requiring acceptance on their part; that the question before them was one of abdication and not of acceptance; and that there was no abdication, as the relator, at all times, performed, or was ready to perform, police duty.
Judge SELDEN was in favor of affirmance, upon what ground, or for what reasons, does not appear; and so the judgment was affirmed by the five judges. The other three — JOHNSON, DENIO and GROVER — dissented, upon the ground that the office of patrolman was a new office, and that the persons designated to fill it should have accepted it and taken the oath of office. Thus it is seen that three of the judges — GRAY, ALLEN and STRONG — held the office not new; that it was by the act continued, and the incumbents in office were continued in office.
Four of the judges held that the office was a new office, created by the legislature; three of the four, that acceptance and oath of office were necessary; and one of the four, that no acceptance, affirmative act, or official oath, was necessary. And one judge was for affirmance, whether for the reasons stated by GRAY and STRONG, or either of them, or for the reasons stated by COMSTOCK, does not appear. *Page 337 
All the judges, who delivered written opinions for affirmance, refer to and comment upon the special facts found by the verdict, and which are not in this case, as showing that the relator had no intention of retiring from office, and that the facts so appearing did not show a resignation or abdication of the office. There is no intimation that the relator could not have rejected the office, refused to take or to hold it, or that a refusal to hold the office, nothing else appearing, would not in effect be a resignation of the office. Nor was there any such question in the case, except as raised or implied by the fact that the relator continued to do police duty under his old captain, in his ward, precisely as he had done the same duties before the passage of the act, not recognizing any authority in the board of police, and believing they had none, until this court corrected his erroneous opinion, when he yielded and reported himself for duty to the proper authority.
That case and this are entirely unlike in the material facts upon which the decision in that case turned, and that case is not an authority controlling this case, or rather requiring an affirmance of this judgment.
There are other differences of more or less importance. In that case there was an attempt, which proved abortive, to remove McCunn. He resorted promptly to the writ of mandamus. In this case, the writ alleges an illegal removal, without saying when, but it must have been early, as the verdict says he never held office under the statute, and so it may be added that the matter of removal was unnecessary, and in fact nugatory; yet the defendant delays for more than two years any proceedings for a restoration to office and for permission to labor for the public, and thus secure pay. This opinion is already too long, and I do not regard a consideration of the question here raised as important to a determination of the case, and shall not consider it. Otherwise, as a mandamus is not a writ of right, it might perhaps be worthy of consideration whether the relator, considering the peculiar nature of the office, and the duties pertaining to it, an office that must be kept filled, should have this writ, after so sleeping upon *Page 338 
his rights, and apparently acquiescing in the illegal amotion, without having ever offered to perform the duties of the office in the meantime.
There are certainly no merits in the case which should induce us to give to the relator anything more that he is entitled to by a strict application of legal rules. The judgment, I think, should be reversed, and that of the special term affirmed.
DENIO, Ch. J., ROSEKRANS and SELDEN, Js., concurred in both the preceding opinions — the latter, however, putting his judgment upon the first and last grounds stated by WRIGHT, J., as did EMOTT, J. BALCOM, J., concurred with WRIGHT, J. DAVIES, J., was for reversal, on the ground last stated by WRIGHT, J.
Judgment reversed, and judgment for defendants.